1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
Brittany S. Scott (State Bar No. 327132)
L. Timothy Fisher (State Bar No. 191626)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: bscott@bursor.com
          ltfisher@bursor.com
          idiaz@bursor.com

*Attorneys for Plaintiff*

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ADRIENNE ST. AUBIN, individually and on behalf of all other persons similarly situated,

       Plaintiff,

   v.

CARBON HEALTH TECHNOLOGIES, INC.,

       Defendant.

Case No. 4:24-cv-00667-JST

<u>CLASS ACTION</u>

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Adrienne St. Aubin ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant, Carbon Health Technologies, Inc. ("Defendant" or "Carbon Health").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used a website owned, operated and/or controlled by Defendant, including https://carbonhealth.com (collectively, "Website").

2.      Defendant aids employs, agrees, and conspires with Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), Google LLC ("Google") and other third-party vendors to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Nationwide Class and the California Class, and there is minimal diversity.

4.      The Court has general personal jurisdiction over Defendant because Carbon Health resides in and does business in the State of California, with its principal place of business in Oakland, California.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

1

## THE PARTIES

2

*Plaintiff*

3

6.      Plaintiff Adrienne St. Aubin is an adult citizen of the state of California and is

4

domiciled in Oakland, California.

5

7.      Plaintiff St. Aubin has used https://carbonhealth.com since 2021.  Plaintiff St. Aubin

6

first accessed the Website to schedule an appointment to obtain a COVID-19 vaccine and has

7

continued to access the website from her laptop to schedule additional COVID-19 vaccine

8

appointments.  Plaintiff St. Aubin has also used Defendant's Website to book an appointment for

9

urgent care.  Because Plaintiff St. Aubin has accessed the Website multiple times to schedule

10

COVID-19 vaccines and other medical issues, and because of Defendant's actions as alleged

11

herein, Plaintiff St. Aubin's use of the Website has led to the unlawful interception of her medical

12

information, including information regarding her medical condition, history, or treatment.

13

Specifically, as a result of Defendant's unlawful conduct as alleged herein, third parties, including

14

Facebook and Google, intercepted information about the medical appointments Plaintiff St. Aubin

15

scheduled on the Website —namely, appointments to obtain COVID-19 vaccinations and for

16

urgent care, along with the location of the appointments.  As a result of Defendant's unlawful

17

conduct, Plaintiff St. Aubin received digital advertisements related to the appointments she

18

previously booked on Defendant's Website.  For example, after scheduling an appointment for her

19

COVID-19 vaccine, Plaintiff received advertisements relating to COVID-19 vaccination.

20

8.      Plaintiff St. Aubin has an active Facebook account which she has maintained for

21

over ten years.  During that time, Plaintiff St. Aubin has routinely logged onto her Facebook

22

account on the same web browser she has used to access Defendant's Website.

23

9.      Pursuant to the systematic process described herein, Defendant assisted third parties,

24

including Facebook and Google, with intercepting Plaintiff St. Aubin's communications, including

25

those that contained personally identifiable information, protected health information, and related

26

confidential information.  Defendant assisted these interceptions without Plaintiff St. Aubin's

27

knowledge, consent, or express written authorization.

28

FIRST AMENDED COMPLAINT
CASE NO. 4:24-CV-00667-JST

2

10.     By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff St. Aubin's personally identifiable information and protected health information.

**Defendant**

11.     Carbon Health Technologies, Inc. is incorporated in the State of Delaware and has its principal place of business in Oakland, California.  Carbon Health is a "modern health chain" that facilitates a variety of health care services for its patients such as urgent care, primary care, and mental health care.[1]  Patients can book appointments with Carbon Health medical providers to access medical care and manage their treatment or diagnosis of medical conditions through a website Carbon Health owns, operates, and controls, including https://carbonhealth.com (collectively, "Website").

## FACTUAL ALLEGATIONS

**A.     Background of the California Information Privacy Act**

12.     The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

13.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of

---

[1] CARBON HEALTH, *About Us*, https://carbonhealth.com/about-us.

any message, report, or communication while the same is in transit or passing over
any wire, line or cable or is being sent from or received at any place within this state,
Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any
way, any information so obtained,
Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do,
or permit, or cause to be done any of the acts or things mentioned above in this section.

14.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new
technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL
8200619, at \*21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be
construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*.,
2006 WL 3798134, at \*5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic
communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)
(reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of
consumers' internet browsing history).

15.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive
relief and statutory damages of $5,000 per violation.

**B.     Background of the California Confidentiality of Medical
Information Act**

16.     Pursuant to the California Confidentiality of Medical Information Act ("CMIA"),
"A provider of health care … shall not disclose medical information regarding a patient of the
provider of health care … without first obtaining an authorization, except as provided in
subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[2]  "An authorization for the release of medical
information … shall be valid if it:

(a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-
point type.

---

[2] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical
information in situations where a government investigation or lawsuit is taking place.  For example,
Carbon Health could bypass the authorization requirement if patient medical information was
requested pursuant to a lawful court order or by a party to a proceeding before a court or
administrative agency pursuant to a subpoena.  *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

(b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c) Is signed and dated …

(d) States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f) States the name or functions of the persons or entities authorized to receive the medical information.

(g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

17.     Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients personally identifiable information and protected health information.  Cal. Civ. Code § 56.36(c).[3]  Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages.  Cal. Civ. Code § 56.36(b).

---

[3] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." (§ 56.101, subd. (a).)

18.     "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000).  In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages.  [¶] (2) The amount of actual damages, if any, sustained by the patient."  *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

### C.     Defendant's Website

19.     Carbon Health is a "modern health chain" that provides access to a variety of health care services to patients, such as urgent care, primary care, and mental health services.  Carbon Health partners with health care providers across the United States, including twenty-six clinics in the California Bay Area, to provide patients with access to health care.[4]  Carbon Health's Website is accessible on mobile devices and desktop computers.  Via the Website, patients can schedule doctor's appointments to obtain medical treatment and manage their medical care.

### D.     Facebook's Platform and its Business Tools

20.     Facebook describes itself as a "real identity platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

---

[4] CARBON HEALTH, *Locations*, https://carbonhealth.com/locations/browse/sf-bay-area.

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[7] FACEBOOK, SIGN UP, https://www.facebook.com/.

21.      In 2021, Facebook generated $117 billion in revenue.[8]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[9]

22.      Facebook sells advertising space by highlighting its ability to target users.[10] Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[13]

23.      Advertisers can also build "Custom Audiences."[14]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15]  With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16]  Unlike Core Audiences,

---

[8] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[9] *Id.* at 63.

[10] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[11] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[12] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[15] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[16] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

advertisers can build Custom Audiences and Lookalike Audiences only if they first supply

Facebook with the underlying data.  They can do so through two mechanisms: by manually

uploading contact information for customers, or by utilizing Facebook's "Business Tools."[17]

24.     As Facebook puts it, the Business Tools "help website owners and publishers, app

developers and business partners, including advertisers and others, integrate with [Facebook],

understand and measure their products and services, and better reach and serve people who might

be interested in their products and services."[18]  Put more succinctly, Facebook's Business Tools are

bits of code that advertisers can integrate into their website, mobile applications, and servers,

thereby enabling Facebook to intercept and collect user activity on those platforms.

25.     The Business Tools are automatically configured to capture certain data, like when a

user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when

a user downloads a mobile application or makes a purchase.[19]  Facebook's Business Tools can also

track other events.  Facebook offers a menu of "standard events" from which advertisers can

choose, including what content a visitor views or purchases.[20]  Advertisers can even create their

own tracking parameters by building a "custom event."[21]

26.     One such Business Tool is the Facebook Pixel (the "Facebook Pixel").  Facebook

offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Facebook

---

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook,
Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.

[19] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK,
APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[20] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

Pixel "tracks the people and type of actions they take."[22]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

27.     Defendant chose to include the Facebook Pixel on its Website.

28.     Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. *Find … people who have visited a specific page or taken a desired action on your website*."  (Emphasis added.)[23]

29.     Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, *the pixel will log when someone takes an action on your website*.  Examples of actions include adding an item to their shopping cart or making a purchase.  *The Pixel receives these actions, or events*, which you can view on your [Facebook Tracking] Pixel page in Events Manager.  From there, you'll be able to see the actions that your customers take.  *You'll also have options to reach those customers again through future Meta ads*.[24]

30.     Of course, in healthcare, it is medical specialists that users "add to their shopping cart."  Patients make doctor's appointments rather than making purchases.

31.     The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own patients outside the Website, but also include individual patients among

---

[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[23] Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Dec. 26, 2023).

[24] *Id.* (Emphasis added.)

groups targeted by ***other*** Facebook advertisers relating to the conditions about which patients communicated on Defendant's Website.

32. Facebook's Business Help Center explains:

Meta ***uses marketing data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[25]

33. In other words, Facebook sells advertising space by highlighting its ability to target users.[26] Facebook can target users so effectively because it surveils user activity both on and off its site.[27] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[28]

34. An example illustrates how the Facebook Pixel works. Take an individual who navigates to Defendant's Website and clicks on the link for "Primary Care" under the "Services" drop-down menu. When that "Primary Care" link is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Carbon Health utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly duplicate the communication with Carbon Health, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

---

[25] Meta, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[26] Meta, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

[27] Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[28] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

35.     After collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**E.      Google's Platform and its Business Tools**

36.     Google offers a range of advertising software, one of which is called Google Analytics.

37.     "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[29]  This is made possible by Google Analytics, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[30]

38.     Researchers from the University of Illinois Urbana-Champaign noted that Google Analytics is the "most popular third-party tracker" that involves the "web site operator add[ing] a fragment of JavaScript provided by Google to their page.  This script then sends telemetry to Google."[31]

39.     Google advertises this service can "[m]onitor activity on your site as it happens."[32]

40.     Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with Google Analytics.

---

[29] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl =en&ref_topic=14089939&sjid=2827624563183915220-NC.

[30] *Id.*

[31] Mingjia Huo, Maxwell Bland & Kirill Levchenko, *All Eyes On Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, (2022) ACM 197, 202, https://dl.acm.org/doi/abs/10.1145/3559613.3563190; *see also* Rahul Awati, *et al.*, *What is Google Analytics*, TECH TARGET, https:www.techtarget.com/searchbusinessanalytics/definitions/Google-Analytics.

[32] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

41.     Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website features like search bars.

42.     Specifically, "[a]mong other pieces of information, Google Analytics sends the page URL and page title to Google in an AJAX request … an AJAX request provides more information than would be sent by loading a third-party resource only."[33]

43.     An example illustrates how Google Analytics works.  Take an individual who navigates to Defendant's Website and clicks on the link for "Primary Care" under the "Services" drop-down menu.  When that "Primary Care" link is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Carbon Health utilizes Google Analytics, Google's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Google causes the browser to simultaneously, contemporaneously and covertly duplicate the communication with Carbon Health, transmitting it to Google's servers, alongside additional information that transcribes the communication's content and the individual's identity.

44.     The information Google receives is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

45.     Once Google intercepts website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[34]

46.     Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands

---

[33] Huo et al., *supra*, note 13 at 202.

[34] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

47.     Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

48.     In sum, Google has the capability to use website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with and data analytics and targeted advertising.

49.     Further, Defendant shares information with Google that amounts to personally identifiable information via its collection of device identifiers and IP addresses.  Device identifiers and IP addresses are types of information that the U.S. Department of Health and Human Services lists as information that should be removed to de-identify a patient in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[35]  Google uses IP addresses and unique device identifiers to track internet users.  Therefore, Defendant is disclosing both PHI and PII to Google as described in the section below.

50.     Yet another type of personally identifiable information obtained from Website users by Google is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

51.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[36]

---

[35] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, GUIDANCE REGARDING METHODS FOR DE-IDENTIFICATION OF PROTECTED HEALTH INFORMATION IN ACCORDANCE WITH THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html#standard.

[36] GOOGLE, BUILDING A MORE PRIVATE WEB, https://www.blog.google/products/chrome/building-a-more-private-web/.

The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[37]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[38]

52.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. [39]

53.     Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

54.     Defendant uses and causes the disclosure of data sufficient for third parties, like Google, to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning reasons for the appointments they are booking and the locations they are booking their appointments at.

F.      **How Defendant Disclosed Plaintiff's and Class Members' Protected Health Information And Assisted With Intercepting Communications**

55.     Through the Facebook Pixel and Google Analytics, among other third parties, Defendant assisted Facebook, Google and others with intercepting the identities and online activity of Defendant's patients, including information related to the type of medical treatment patients were seeking and for which they booked appointments.

56.     When a patient enters https://carbonhealth.com, they are able to "[s]earch symptoms and services" in the "Book an Appointment" search bar on the Website's landing page.  *See* Figure 1.  For example, a patient can search "pap smear" in the search box to find appointments with health care providers to have a pap smear exam performed.

---

[37] Chris Hauk, *What is Browswer Fingerprinting? How it Works and How to Stop it*, https://pixelprivacy.com/resources/browser-fingerprinting/.

[38] *Supra* note 37.

[39] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

**Figure 1**



57.     After searching for a "symptom or service," such as a pap smear, a patient is directed to a page on Defendant's Website where they can see available appointments to treat the symptoms or services they searched for.  *See* Figure 2.

**Figure 2**



58.      Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information about the Website page the patient reached.  This information includes the description of the type of care patient is seeking, which is included in the URL.  For example, if a patient searches for "pap smear," they will be taken to the Website page with the URL: carbonhealth.com/get-care/pap-smear.  *See* Figure 3.  When Facebook intercepts this communication due to Defendant's integration of the Facebook Pixel, Facebook effectively intercepts the medical concern for which the patient searched and for which the patient is attempting to obtain care.  *See id.*; Figure 4.

**<u>Figure 3</u>**



1

**Figure 4**



59.     When patients book an appointment, Facebook continues to intercept information via the embedded Facebook Pixel about the type of appointment a patient is booking along with the name of the clinic where the patient will have their appointment.  For example, as seen in Figure 5 and 6 below, when a patient books an appointment for cold and flu symptoms, as a result of Defendant's integration of the Facebook Pixel, Facebook intercepts: (1) the "appointment-reason" "cold-flu-symptoms" – *i.e.*, Facebook intercepts the patient's reason for their appointment; and (2) the "location=alameda-ca" which tells Facebook where the patient will be seeking medical care.

**Figure 5**



1
2                                  **Figure 6**
3

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25        60.     Each time Facebook intercepts this activity data via the Facebook Pixel integrated

26 into the Website by Defendant, it also intercepts a patient's personally identifiable information,

27 including their Facebook ID ("FID").  A FID is a unique and persistent identifier that Facebook

28

assigns to each user.  With it, anyone ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

61.     A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

62.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

63.     One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[40]  Facebook, at a minimum, uses the fr cookie to identify users.[41]

64.     If a visitor has never created an account, an even smaller set of cookies are transmitted.

65.     At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[42]

66.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[43]  Otherwise, the c_user cookie is cleared when the browser exits.[44]

67.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[45]  If that happens, the time resets, and another 90 days begins to accrue.[46]

---

[40] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[41] FACEBOOK, PRIVACY CENTER–COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[42] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[43] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[44] Id.

[45] See id.

[46] Confirmable through developer tools.

68.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[47]  If that happens, the time resets, and another 90 days begins to accrue.[48]

69.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Carbon Health.[49]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[50]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

70.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

71.     Defendant's integration of Google Analytics similarly allows Google to intercept information about: (1) the reason patients booked a medical appointment on Defendant's Website and the location for those appointments; and (2) patients' IP addresses and device identifiers that could be used to personally identify patients.

72.     For example, when a patient uses the "Book an Appointment" search bar to search for a "symptom or service," (*See* Figure 1) such as "covid-19", a patient is given various appointment options such as booking a "COVID-19 Virtual Visit" or obtaining "Cold, Flue & COVID Testing."  *See* Figure 7.

---

[47] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[48] Also confirmable through developer tools.

[49] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[50] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

1

2

**Figure 7**



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        73.    If a patient then chooses the option to book a COVID-19 Virtual Visit, for example,

24  they are directed to a page on the Website where they can choose to press a button to "Find a time"

25  to book a virtual appointment.  *See* Figure 8.  At this stage, Google Analytics collects the full-string

26  URL that Defendant generates which includes the type of appointment a patient is attempting to

27  book.  *See id.*  In this example, that includes the information "get-care" and "virtual-covid-19-

28

visit." *See id.;* Figure 9.

**Figure 8**



**Figure 9**



74.     Once a patient clicks on the "Find a time" button, they are directed to a page on Defendant's Website where they can choose an appointment time. *See* Figure 10.  Here, Google collects the full-string URL on Defendant's website that includes the reason why the patient is booking the appointment. *See id.*; Figure 11.

**Figure 11**



**Figure 12**



75.     Additionally, Defendant's integration of Google Analytics, among other third-party technologies, allows Google and others to create a browser-fingerprint identifier with each re-directed communication described herein, including information on the appointments patients book.

76.     Plaintiff used Defendant's Website to book COVID-19 vaccine appointments and an urgent care appointment.  Google and Facebook intercepted Plaintiff's PII and PHI as shown in the examples above.  Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her personally identifiable information and protected health information.  Plaintiff was never provided with any written notice that Defendant integrated code into its Website that allowed

third parties to intercept Website users' PHI, nor was she provided any means of opting out of such disclosures.

77.     In fact, Defendant states in its Privacy Policy that it "will not use Protected Health Information for any purpose that is not defined in [its] HIPAA Privacy Practices, including advertising or marketing purposes, without [patients'] consent."[51]  Nonetheless, as demonstrated hereinabove, Defendant knowingly disclosed Plaintiff's PHI to Facebook, Google and others and failed to obtain Plaintiff's authorization for the disclosure of medical information.

78.     By law, Plaintiff is entitled to privacy in her PHI and confidential communications. Defendant deprived Plaintiff of her privacy rights when it: (1) implemented a system that surreptitiously allowed third parties, including Facebook and Google, to track, record, and intercept Plaintiff's and other online patients' confidential communications, personally identifiable information, and PHI; and (2) undertook this pattern of conduct without notifying Plaintiff and without obtaining her express written consent.  Plaintiff did not discover that Defendant engaged in the unlawful conduct alleged herein until January of 2024.

**G.     Federal Warning on Tracking Codes on Healthcare Websites**

79.     The government has issued guidance warning that tracking code like the Facebook Pixel may violate federal privacy law when installed on healthcare websites such as Defendant's. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[52]

80.     Health care organizations regulated under the HIPAA may use third-party tracking tools, such as the Facebook Pixel, in a limited way, to perform analysis on data key to operations.

---

[51] CARBON HEALTH, CARBON HEALTH PRIVACY POLICY, https://carbonhealth.com/privacy-policy#DisclosureofYourInformation.

[52] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.  The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.  ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[53]

81.     The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others.  For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***.  Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule***.[54]

82.     Plaintiff and Class Members face just the risks about which the government expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff's and Class Members' booking of doctors' appointments on Defendant's Website, the reason for the appointments that were booked, and the Carbon Health locations where Plaintiff and Class Members sought to obtain medical care.  This information is, as described by the OCR in its bulletin, "highly sensitive."

83.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[55]

---

[53] *Id.* (Emphasis added.)

[54] *Id.* (Emphasis added.)

[55] *Id*. (Emphasis added.)

84.     Crucially, that paragraph in the government's Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.*** *This is because,* ***when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.***[56]

85.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

---

[56] *Id.* (Emphasis added.)

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

… Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule … [57]

Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC

and HHS.

86.     In light of, and in addition to, the government's own issued guidance above, news

sources are also warning that tracking code, like the Facebook Pixel, poses risks of violating

federal privacy law and HIPAA:

Federal regulators are warning [regulated entities] hospital systems and telehealth providers about the data privacy risks of using third-party tracking technologies.

These services, like [Facebook Tracking] Pixel or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[58]

---

[57]     Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[58] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, FIERCE HEALTHCARE, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google

Fierce Healthcare also spoke up in an April 3, 2023 article:

> Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205].   The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.
>
> The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[59]

Health Affairs also published an article in April 2023, stating:

> By including third-party tracking code on their websites, hospitals [regulated entities] are facilitating the profiling of their patients by third parties.  These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share.  These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[60]

87.     This is further evidence that the data that Defendant chose to share is protected Personal Information.  The sharing of that information was a violation of Class Members' rights.

## **CLASS ACTION ALLEGATIONS**

88.     Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons in the United States who, during the class period, had their personally identifiable

---

[59] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[60] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

information or protected health information improperly disclosed to Facebook, Google, and other third party entities, as a result of using the Website (the "Class" or "Nationwide Class").

89.     Plaintiff also seeks to represent a subclass consisting of Class members who, during the class period, had their personally identifiable information or protected health information improperly disclosed to Facebook, Google, and other third party entities, as a result of using the Website while located in California (the "California Subclass" or "Subclass").

90.     Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

91.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

92.     Excluded from the Class and Subclass is Carbon Health; any affiliate, parent, or subsidiary of Carbon Health; any entity in which Carbon Health has a controlling interest; any officer director, or employee of Carbon Health; any successor or assign of Carbon Health; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

93.     <u>Numerosity/Ascertainability</u>.  Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class and Subclass Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class and Subclass.  The identity of such membership is readily ascertainable from Carbon Health's records and non-party records, such as those of Facebook and Google.

94.     <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class and Subclass because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had her personally identifiable information and PHI intercepted by third parties, such as Facebook and Google, without her express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class and Subclass Members.

95.     <u>Adequacy</u>.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class and Subclass.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass.

96.     <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u>  Questions of law and fact common to the members of the Class and Subclass predominate over questions that may affect only individual members of the Class and Subclass because Defendant has acted on grounds generally applicable to the Class and Subclass.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Classes include:

(a)     Whether Defendant intentionally tapped the lines of internet communication between patients and their medical providers;

(b)     Whether Carbon Health's Website contains code that permits third parties, such as Facebook and Google, to intercept patients' personally identifiable information, protected health information, and related communications;

(c)     Whether Facebook and Google are third-party eavesdroppers;

(d)     Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(e)     Whether Carbon Health's conduct, which allowed Facebook, Google, and other entities—unauthorized persons—to view Plaintiff's and Class Members' personally identifiable information and PHI, resulted in a breach of confidentiality;

(f)     Whether Carbon Health violated Plaintiff's, Class, and Subclass Members' privacy rights by using third-party technology, such as the Facebook Pixel and Google Analytics, to allow third parties to intercept patients' online communications along with information that uniquely identified the patients;

(g)    Whether Plaintiff, Class, and Subclass Members are entitled to damages under CIPA, the CMIA, or any other relevant statute; and

(h)    Whether Defendant's actions violate Plaintiff's, Class, and Subclass Members' privacy rights as provided by the California Constitution

97.    <u>Superiority</u>.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 631
(On Behalf Of The Class)**

98.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

99.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications … "  Cal. Penal Code § 630.

100.    A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone

wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained …

Cal. Penal Code § 631(a).

101.   Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

102.   To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

103.   At all relevant times, Defendant aided, agreed with, and conspired with third parties, including, Facebook and Google, to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

104.   Defendant, when aiding and assisting the wiretapping by the above-described third parties, including Facebook and Google, intended to help those third parties learn some meaning of the content in the URLs and the content the visitor requested.

105.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and Google Analytics fall under the broad catch-all category of "any other manner":

a.   The computer codes and programs Facebook, Google and other third parties used to track Plaintiff and Class Members' communications while they were navigating the Website;

b.   Plaintiff's and Class Members' browsers;

c.   Plaintiff's and Class Members' computing and mobile devices;

d.   Facebook and Google's web and ad servers;

e.      The web and ad-servers from which Facebook, Google and other third parties tracked and intercepted the Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f.      The computer codes and programs used by Facebook, Google and other third parties to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

g.      The plan Facebook, Google and other third parties carried out to effectuate their tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser to visit Defendant's website.

106.    The patient communication information that Carbon Health permitted Facebook, Google and other third parties to intercept via Carbon Health's integration of the Facebook Pixel, Google Analytics and other code, including doctor appointment booking information, the reasons for the appointment, and the location of the clinic a patient seeks to obtain medical treatment at constitutes PHI.

107.    As demonstrated hereinabove, Carbon Health violated CIPA by aiding and permitting third parties to receive its patients' online communications through its Website without their consent.

108.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

109.    Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**
**(On Behalf Of The California Subclass)**

110.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Subclass.

111.    Under the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients, without a patient's authorization.  Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental or physical condition, or treatment.  "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual… "

112.    The CMIA § 56.06(a) defines a provider of health care as "[a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual"

113.    Plaintiff and Subclass Members are patients under the definition of the CMIA because Plaintiff and Subclass Members received "health care services from a provider of health care" and the information Defendant shared to Facebook was "medical information pertain[ing]" to Plaintiff and Subclass Members.  Cal. Civ. Code § 56.05(m).

114.    Carbon Health is a provider of health care under Cal. Civ. Code § 56.06(a) because it is an organization designed to provide patients with access to health care and provides a platform from which patients can manage their diagnosis or treatment of their medical conditions.  Because Carbon Health is deemed a provider of health care, it has an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

115.    As set forth hereinabove, a Facebook ID is an identifier sufficient to allow identification of an individual.  Along with patients' Facebook ID, Carbon Health disclosed to Facebook several pieces of information regarding its patients' use of its Website, which, on information and belief, included, but is not limited to: patients' medical conditions for which they were seeking medical appointments, the reason for the appointment patients were booking a doctor's appointment for, and the location the patients' sought to have their medical care appointments.

116.    Similarly, as set forth hereinabove, Google and other third-parties' collection of website users' IP addresses and unique device identifiers amount to information sufficient to allow the identification of an individual.  Along with patients' IP addresses and device identifiers, Carbon Health disclosed to Google and other third parties several pieces of information regarding its patients' use of its Website, which, on information and belief, included, but is not limited to: patients' medical conditions for which they were seeking medical appointments, the reason for the appointment patients were booking a doctor's appointment for, and the location the patients' sought to have their medical care appointments.

117.    This patient information is derived from a provider of health care regarding patients' medical treatment and physical condition.  Accordingly, it constitutes medical information pursuant to the CMIA.

118.    Carbon Health states in its Privacy Policy that it "will not use Protected Health Information ("PHI") for any purpose that is not defined in [its] HIPAA Privacy Practices, including advertising or marketing purposes, without [patients'] consent."[61]  However, as demonstrated hereinabove, Carbon Health fails to obtain its patients' authorization for the disclosure of medical information to Facebook and Google, among others, which is done for marketing purposes.

119.    Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must be (1) "Clearly separate from any other language present on the same page and is

_____

[61] CARBON HEALTH, CARBON HEALTH PRIVACY POLICY, https://carbonhealth.com/privacy-policy#DisclosureofYourInformation.

executed by a signature which serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires.  Accordingly, the information set forth in Carbon Health's Privacy Policy, does not qualify as a valid authorization.

120.    Based on the above, Carbon Health violated the CMIA by disclosing its patients' medical information to Facebook and Google, among others, along with the patients' Facebook ID, IP addresses, and device identifiers, while failing to obtain patient's valid authorization for the disclosure of medical information.

121.    Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.

**COUNT III**
**Invasion Privacy Under California's Constitution**
**(On Behalf Of The Class and California Subclass)**

122.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class and Subclass.

123.    Plaintiff , Class, and Subclass Members have an interested in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff, Class, and Subclass Members' knowledge or consent.

124.    At all relevant times, by using the Facebook Pixel and Google Analytics, among other third-party code, to record and communicate patients' FIDs, IP addresses, and device identifiers alongside their confidential medical communications, Carbon Health intentionally invaded Plaintiff's, Class, and Subclass Members' privacy rights under the California Constitution.

125.   Plaintiff, Class, and Subclass Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential and that Carbon Health would not install wiretaps on the Website.

126.   Plaintiff, Class, and Subclass Members did not authorize Carbon Health to record and transmit Plaintiff's, Class, and Subclass Members' private medical communications alongside their personally identifiable health information.

127.   This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

128.   Accordingly, Plaintiff, Class, and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.   For a determination that this action is a proper class action;

    b.   For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

    c.   For an order declaring that Defendant's conduct violates the statutes referenced herein;

    d.   For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

    e.   For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

    f.   For punitive damages, as warranted, in an amount to be determined at trial;

g.   For an order requiring Defendant to disgorge revenues and profits wrongfully

     obtained;

h.   For prejudgment interest on all amounts awarded;

i.   For injunctive relief as pleaded or as the Court may deem proper;

j.   For an order awarding Plaintiff, the Class, and the Subclass their reasonable

     attorneys' fees and expenses and costs of suit; and

k.   For an order granting Plaintiff, Class, and Subclass Members such further relief

     as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff on behalf of herself and the proposed Class and Subclass, demands a trial by jury
for all of the claims asserted in this Complaint so triable.


Dated: October 22, 2024                    Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**


                                           By:    ____/s/ Brittany S. Scott_____


                                           Brittany S. Scott (State Bar No. 327132)
                                           L. Timothy Fisher (State Bar No. 191626)
                                           Ines Diaz Villafana (State Bar No. 354099)
                                           1990 North California Blvd., 9th Floor
                                           Walnut Creek, CA 94596
                                           Telephone: (925) 300-4455
                                           Facsimile:  (925) 407-2700
                                           E-Mail: ltfisher@bursor.com
                                                   bscott@bursor.com
                                                   idiaz@bursor.com

                                           **BURSOR & FISHER, P.A.**
                                           Philip L. Fraietta (State Bar No. 354768)
                                           1330 Avenue of the Americas, 32nd Floor
                                           New York, NY 10019
                                           Telephone: (646) 837-7408
                                           Facsimile: (212) 989-9163
                                           E-mail: pfraietta@bursor.com

                                           **DRURY LEGAL, LLC**
                                           Scott R. Drury (State Bar No. 355002)

6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiff and the Putative Class*